IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| MICHELE VILLANUEVA, RUSSELL SUBIA, MARISA MCCONVILLE, LIAM MCCONVILLE, and KATHRYN LANGER, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | 1:23-CV-1246-RP |
| VILLAGE OF VOLENTE, TEXAS, | § § § | |
| Defendant. | § § | |

## ORDER

Before the Court is Plaintiffs Michele Villanueva, Russell Subia, Marisa McConville, Liam McConville, and Kathryn Langer's (collectively, "Plaintiffs") motion for a preliminary injunction. (Dkt. 10). Defendant Village of Volente, Texas (the "Village") filed a response in opposition, (Dkt. 12), and Plaintiffs filed a reply, (Dkt. 15). The Court held an evidentiary hearing on the motion on March 21, 2024. (Dkt. 19). The Court also allowed the parties to file additional letter briefs. (Dkts. 22, 23). Having considered the parties' arguments, the evidence presented, and the relevant law, the Court will deny Plaintiffs' motion for a preliminary injunction.

## I. BACKGROUND

### A. The History of Short-Term Rental Regulation in the Village of Volente

This case involves three sets of homeowners challenging the Village of Volente's regulation of short-term rentals ("STRs"). The Village is a municipality on the shores of Lake Travis that has about 600 full-time residents. It is a small community that does not contain its own police force and instead relies on the Travis County Sheriff's Office to respond to emergencies. (Def.'s App'x, Dkt. 12-1, at 3). The Village is marked by narrow but deep lots that are often gated, and in some cases, are screened from public view. (*Id.*). Over the last ten years, the Village has enacted a series of

ordinances to regulate STRs in response to resident concerns over the operation of STRs in their community.

The Village first addressed STRs in 2014 with Ordinance 2014-O-11 (the "2014 Ordinance"), which amended the Village's zoning ordinance to require a conditional use permit ("CUP" or "permit") for individuals who wished to rent their residences for a period of less than thirty days. (2014 Ordinance, Dkt. 10-1, at 2–3). The 2014 Ordinance then authorized STRs by permit in a series of single-family residential zoning districts. (*Id.* at 4–5). Under the 2014 Ordinance, to receive an STR CUP, a homeowner would first submit an application with basic information about how the residence would be used as an STR, accompanied by an affidavit that stated that she had sent notice to all her neighbors within 500 feet of the property that the homeowner had applied for an STR permit. (*Id.* at 3). The Village Administrator would then review the application to determine if it was "administratively complete." If it was, then the Village Administrator was authorized to issue the permit. If the Village Administrator determined that the application was not administratively complete and the homeowner disagreed, the Village's Planning and Zoning Commission would instead make that determination. If the Village Administrator refused to issue the permit, the homeowner could appeal the Administrator's decision to the Village's City Council. (*Id.*).

In 2015 and 2016, the Village passed two more ordinances that slightly amended the STR permitting process. Ordinance 2015-O-02 (the "2015 Ordinance") added a requirement of public notice and public hearings before an STR permit could be authorized, as provided for in Chapter 211 of the Texas Local Government Code. (2015 Ordinance, Dkt. 10-1, at 4–5). The 2015 Ordinance stated that after an STR application was submitted to the Village and upon "receipt of the recommendation from the Village," the Planning and Zoning Commission would hold a public hearing in order to formulate its recommendation to the City Council. The Council would then

make the final decision on the application. Under the ordinance, both the Commission and City Council were instructed to make their decision on any particular STR application based on "the impact of the [STR] on and the compatibility of the [STR] with, surrounding properties and neighborhoods to ensure the appropriateness of the use at a particular location." (*Id.* at 5). In 2016, the Village enacted Ordinance 2016-O-174 ("2016 Ordinance") to expand the category of officials who could administratively approve an STR application to a "Village Official," rather than the "Village Administrator" exclusively. The 2016 Ordinance also clarified that the Planning and Zoning Commission public hearing would be held after the Commission received a Village Official's recommendation on the application. (2016 Ordinance, Dkt. 10-3, at 3–4).

On August 21, 2018, the Village once again amended the STR regulations. Ordinance O-2018-08-01 ("2018 Ordinance") added additional requirements to the initial application process, such as a requirement that the homeowner have the home inspected by a village official for fire, safety, and health purposes. (2018 Ordinance, Dkt. 10-4, at 5–6). The most significant amendment, however, was that the 2018 Ordinance enlarged the role that public feedback would play in the process of maintaining an STR permit. The 2018 Ordinance instituted a formal complaint structure that allowed Village residents or employees to submit a written complaint regarding an STR residence to the Village. The ordinance mandated that the Village would notify an STR permit holder of the complaint and would forward the complaint to the Village's Board of Adjustment. The Board of Adjustment would then hold a public hearing and make a final written finding determining if the complaint was "substantiated." If a permit holder received three substantiated complaints within one twelve-month period, then the STR permit would be revoked, and the permit holder could appeal the revocation or wait twelve months to reapply for a new permit. (*Id.* at 10–11).

**B. The 2023 Ordinance**

On March 9, 2023, the Village passed a new ordinance that amended the STR permitting process, Ordinance No. 2023-O-2016 ("2023 Ordinance" or the "Ordinance"). In enacting the 2023 Ordinance, the City Council made the following findings: (1) "regulating short-term rentals is necessary for the health, safety and welfare of the general public, the promotion of consistent land uses and development, and the protection of landowners and residents of the Village of Volente; (2) "the historical nature of the community is residential and the City Council wishes to preserve the quiet enjoyment of single-family residential neighborhoods, which are the primary land use within the City, protect property values, and to promote orderly and safe use of property within these neighborhoods"; and (3) "the unregulated use, placement and operation of short-term rentals creates an additional enforcement burden, and merits a stand-alone ordinance to provide clear regulations for the permitting and licensing of such rentals." (2023 Ordinance, Dkt. 10-5, at 1). The Village passed the 2023 Ordinance after holding two public hearings and inviting public comment before the Planning and Zoning Commission and the City Council. (*Id.* at 2).

Similar to the previous ordinances, the 2023 Ordinance states that STRs are not authorized in a residential or commercial zoned district in the Village unless a property owner receives a conditional use permit. (*Id.* at 5). The Ordinance defines "short-term rental" as the use of any dwelling unit or portion thereof, which is occupied for transient or temporary human occupancy for less than thirty consecutive days. (*Id.* at 4). Any violation of the Ordinance is a Class C misdemeanor punishable by revocation of an STR permit or a fine ranging from $200–$750 per day, depending on the number of violations the permit holder had received before the current offense. (*Id.* at 13–14).

The 2023 Ordinance lays out the following permitting application process, which in many ways mirrors the process as set out under the previous ordinances. First, a property owner must submit an application that involves certifying that she has complied with various requirements. (*Id.*

at 5–7). One of the requirements is that the property owner must submit an affidavit that states that she has notified neighbors within 500 feet of the property of her STR application by giving them, among other things, information about how to report violations of the STR ordinance. (*Id.* at 6–7). Second, the City Secretary shall conduct an administrative review of the application to determine if the application is complete. Third, the Planning and Zoning Commission will hold a public hearing on the application after which it will make a recommendation to the City Council. Fourth, the City Council will then hold a public hearing and make a final decision on the STR application. (*Id.* at 7–8). The Ordinance instructs that when considering STR applications, both the Commission and the Council shall evaluate "the impact of the STR's use on and the compatibility of the use with surrounding properties to ensure the appropriateness of the use at a particular location." (*Id.* at 8). The Ordinance also gives both bodies the authority to recommend or impose conditions on the STR use that are "reasonably necessary to assure compliance with the[] standards and the purpose and intent of" the ordinance. (*Id.*).

The 2023 Ordinance also lays out a process by which Village residents can submit a written complaint to the City Secretary regarding an STR. The City Secretary is mandated to notify the property owner or operator within ten business days of any "substantiated complaint."[1] If the City Secretary finds that an STR owner has received three separate "substantiated complaints" in one twelve-month period, the STR permit shall be suspended. The Planning and Zoning Commission will then hold a public hearing to determine whether to recommend that the City Council revoke the STR permit. (*Id.* at 11–12). The Ordinance stipulates that the City Council, after public notice and a public hearing, has the authority to revoke a permit for the following reasons: (1) if there has been a

---

[1] The Ordinance defines "substantiated complaint" as: "Any written complaint submitted to the City Secretary or designated Village Officer and determined to be an ordinance violation, and/or a violation of state law that is supported or verified by corroborating information, for example the report of an investigating police officer, photographic documentation or an audio or video recording. The allegations in the complaint do not have to be the subject of a criminal complaint or result in a criminal conviction for a complaint to be substantiated." (2023 Ordinance, Dkt. 10-5, at 4–5).

substantial violation of the conditions of the CUP or a substantiated violation of any village ordinance or state law or regulation; (2) if the property owner has maintained the property in such a manner that is detrimental to the public's health or safety or in a manner that constitutes a nuisance; (3) or if there has been a discontinuance of the STR use altogether. (*Id.* at 12). If an STR permit is revoked, the owner must wait one year before filing a new STR conditional use application. (*Id.*).

### C. The Plaintiffs

#### 1. Subia and Villanueva

Plaintiffs are three sets of homeowners who allege that the 2023 Ordinance violates their constitutional rights. The first set of homeowners is Russell Subia ("Subia") and Michelle Villanueva ("Villanueva") who purchased their home at 16601 Jackson Street in 2018. They began to use the home for STRs in 2021 but did not receive a permit from the Village before beginning to use their home for STRs. (Mot., Dkt. 10, at 10). In April 2022, the Village discovered that they were engaging in STRs without a permit. The Village sent the couple a letter informing them that a violation of the STR Ordinance could result in a fine and instructing them on how they could obtain an STR permit. (April 21 Letter, Dkt. 10-10). Subia and Villanueva then ceased contracting for new rentals and began the process for submitting an STR application. (Mot. Prelim. Inj., Dkt. 10, at 10).

Subia and Villanueva submitted their first STR application in July 2022. (Def.'s App'x, Dkt. 12-1, at 48). After public hearings in August 2022, the City Council voted to deny Subia and Villanueva's first STR application for allegedly violating the Village's STR Ordinance and Nuisance Ordinance. (*Id.* at 90). The Village's records indicate that prior to the City Council's vote, the Council heard complaints from three residents about how the operation of STRs on Subia and Villanueva's property constituted a nuisance. (*Id.* at 89). The records also indicate that two different residents submitted email complaints prior to these hearings that allege numerous noise and parking issues related to STRs at the Subia and Villanueva property. (*Id.* at 57–60). In total, the Village's

records indicate that the Village received ten complaints about the Subia and Villanueva property between March and April 2022. The complaints mostly concerned noise disturbances, but complaints were also received regarding issues such as a septic odor, trespassing, parking, and a drone flying from the property onto a neighbor's property. (Villanueva Council Hr'g Packet, Dkt. 10-12, at 31).

After their first application was denied, Subia and Villanueva submitted a second STR application in February 2023. (*Id.* at 11). Public hearings were held before the Planning and Zoning Commission and City Council in April and May 2023. (*Id.* at 6). The Planning and Zoning Commission recommended that their application be approved with certain conditions. (*Id.*). However, the City Council denied the application after hearing from five residents who shared complaints about the operation of STRs at Subia and Villanueva's property. (May 16, 2023 Hr'g Minutes, Dkt. 10-15, at 6–8). Subia and Villanueva dispute the accuracy of the statements made about alleged nuisances and parking issues at their property. (Mot. Prelim. Inj., Dkt. 10, at 11). At the Court's preliminary injunction hearing, Villanueva testified that they never received any citations regarding these issues. (Minute Entry, Dkt. 19). She also testified that as a result of their permit being denied, they are unsure whether can continue to cover the expenses for maintaining the property. (*Id.*).

### 2. The McConvilles

The second set of homeowners in this case is Marisa McConville and Liam McConville (the "McConvilles"), who bought their home at 8120 Joy Road in 2018. (Mot. Prelim. Inj., Dkt. 10, at 11). Within a month of moving in, the McConvilles obtained an STR permit from the Village and proceeded to rent out the home when they did not stay in it. They received renewed permits annually until 2023. (*Id.* at 11–12). The McConvilles submitted a renewed application in the spring of 2023. The Village initially rejected their application in August 2023, requiring that the McConvilles

have a new home survey done and receive a new septic permit. (*Id.* at 12). The City Council waived the normal waiting period That applies after an STR application is denied and allowed the McConvilles to submit another application shortly thereafter.

At a hearing in October 2023, the Planning and Zoning Commission heard testimony on the McConvilles' second STR application and decided, by a 2-1 vote, to recommend that their STR application be approved. (Oct. 10, 2023 Hr'g Minutes, Dkt. 10-16). When the City Council met in November 2023 to consider the application, the Council, however, decided to deny the application. (Def.'s App'x, Dkt. 12-1, at 97–100). The Council heard live testimony from one neighbor who complained about the noise and safety concerns that have resulted from STRs at the property. The mayor also read into the record a statement that was provided by a different neighbor who requested that the application be denied. (*Id.*). Ultimately the meeting minutes reflect that the Council had concerns that there were "compatibility issues" with approving an STR permit at the McConville property due to issues involving parking, lot density on their street, and proximity to other STR's and single-family residences on their street. (*Id.* at 100).

The McConvilles dispute the veracity of the statements made at the Council meeting. They state that they have never received a noise, nuisance, parking, or other violation at their property. Marisa McConville testified at the preliminary injunction hearing that if they were unable to use their home for STRs and receive the income from these rentals, they would be unable to afford the expenses associated with the home and would be forced to sell. (Mot. Prelim. Inj., Dkt. 10, at 12–13; Minute Entry, Dkt. 19).

### 3. Kathryn Langer

The third plaintiff in this case is Kathryn Langer ("Langer") who bought her home at 8116 Joy Road in 2016. (Mot. Prelim. Inj., Dkt. 10, at 13). Langer rents out the main house at the property

for STRs and lives in a small dwelling at the rear of the property. STRs at the main house are

Langer's primary source of income. Before 2023, she received annual permits from the Village. (*Id.*).

In 2023, Langer went through the process to have her STR permit renewed and at a public

hearing on August 15, 2023, the City Council approved Langer's application. In authorizing STRs at

Langer's property, the City Council passed an ordinance, Ordinance No. 2023-O-221 (the "Langer

Ordinance"), which authorized the conditional use permit at her property. (Langer Ordinance, Dkt.

10-18, at 2–4). The Langer Ordinance included certain conditions that were imposed on the STR

permit including, *inter alia*, that the max occupancy of the property at any time is eight, parking

should not exceed eight cars on the premises, and that "outdoor activities end at 10:00 pm to 7:00

am." (*Id.* at 20). The conditions page of the Langer Ordinance also stated that "[n]o rental of

accessory structure should ever occur." (*Id.*). Langer believes that the 2023 Ordinance's public

complaint and revocation process places her at risk of losing her permit and her primary source of

income at any time. (Mot. Prelim. Inj., Dkt. 10, at 13–14). Langer also testified that she believes that

the Langer Ordinance prohibits her from engaging in outdoor activities between the hours of 10:00

pm and 7:00 am, which she alleges violates her freedom of assembly. (*Id.*; Minute Entry, Dkt. 19).

### D. The Current Lawsuit

Plaintiffs filed their complaint in this Court on October 16, 2023. (Dkt. 1). They then filed

an amended complaint on December 28, 2023. (Dkt. 8). Plaintiffs bring a variety of claims under the

U.S. and Texas Constitutions to challenge the legality of the 2023 Ordinance and the Langer

Ordinance. They filed the present motion for a preliminary injunction on January 23, 2024. (Dkt.

10). Plaintiffs ask this Court for an injunction enjoining the Village from enforcing the 2023

Ordinance against them and the Langer Ordinance against Langer. (*Id.* at 21). They focus their

preliminary injunction motion on three claims: a retroactivity claim under the Texas Constitution, an

ultra vires claim under Texas law, and a freedom of assembly claim under the U.S. and Texas Constitutions. (*Id.* at 16, 18–19).

The Court held a hearing on the motion for a preliminary injunction on March 21, 2024. (Minute Entry, Dkt. 19). The Court heard testimony from three of the plaintiffs: Michele Villanueva, Marisa McConville, and Kathryn Langer. (Witness List, Dkt. 20). It also heard testimony from former Village Administrator and Secretary Lacie Hale, who worked for the Village from April 2022 until November 2023. (*Id.*). The Court also heard arguments from counsel. At the conclusion of the hearing, the Court invited the parties to submit letter briefs to further explicate the ultra vires claim and issues related to zoning. The parties submitted these letter briefs on March 25 and 27. (Dkts. 21, 22). Having considered all the briefs and exhibits submitted by the parties and the testimony and argumentation offered at the March 21 hearing, the motion for preliminary injunction is now ripe for resolution.

## II. LEGAL STANDARD

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1050 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden of persuasion on all four requirements. *PCI Transp. Inc. v. W. R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005). A movant cannot be granted a preliminary injunction unless it can establish that it will suffer irreparable harm without an injunction. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001).

### III. DISCUSSION

Plaintiffs focus their motion for a preliminary injunction on three claims. First, Plaintiffs assert that the 2023 Ordinance is unconstitutionally retroactive under the Texas Constitution because it takes away a settled property right to lease for short terms. Second, Plaintiffs argue that the 2023 Ordinance exceeds the Village's regulatory authority under Texas law because it is not a zoning ordinance, or alternatively, because it is a zoning ordinance that is arbitrary, capricious, or unreasonable. Last, Langer argues that the conditions placed on her STR permit violate her freedom of assembly under the U.S. and Texas Constitutions. The Court turns first to assessing the likelihood of Plaintiffs' success on the merits of these claims. The Court addresses each claim in turn.

### A. Retroactivity

Plaintiffs argue that the 2023 Ordinance violates Article 1, Section 16 of the Texas Constitution, which states that "[n]o bill of attainder, ex post facto law, retroactive law, or any other law impairing the obligation of contracts shall be made." Tex. Const. art. I, § 16. "A retroactive statute is one which gives preenactment conduct a different legal effect from that which it would have had without the passage of the statute." *Union Carbide Corp. v. Synatzske*, 438 S.W.3d 39, 60 (Tex. 2014). The Texas Supreme Court has identified three factors that courts must consider in determining whether a retroactive law is unconstitutional: (1) "the nature and strength of the public interest served by the statute as evidenced by the Legislature's factual findings"; (2) "the nature of the prior right impaired by the statute"; and (3) "the extent of the impairment." *Robinson v. Crown Cork & Seal Co.*, 335 S.W.3d 126, 145 (Tex. 2010). This three-part test acknowledges the heavy presumption against retroactive laws by requiring a compelling public interest to overcome the presumption. *Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698, 707 (Tex. 2014) (citing *Robinson*, 335 S.W.3d

11

at 145). But the *Robinson* test also appropriately encompasses the notion that "statutes are not to be set aside lightly." *Id.*

Plaintiffs do not directly address the three *Robinson* factors in their motion but instead ask this Court to follow a recent series of decisions that "all go the same way in holding that a municipality's ban on short-term home rentals is unconstitutionally retroactive where a property owner already had a settled (vested) right to lease for short terms." (Mot., Dkt. 10, at 16). Plaintiffs rely most heavily on *Zaatari v. City of Austin*, 615 S.W.3d 172 (Tex. App.–Austin 2019, pet. denied), a case in which the Third Court of Appeals found that the City of Austin's ban on STRs at non-homestead properties was unconstitutionally retroactive because it eliminated a property owner's settled right to lease her property for short terms while serving a minimal public interest, *id.* at 188–192. Dealing with a similar ordinance from the City of Austin and partially relying on *Zaatari*, this Court has also issued an order finding that the City of Austin's ban on STRs at non-homestead properties is unconstitutionally retroactive. *See Anding v. City of Austin*, No. 1:22- CV-01039-DAE, 2023 WL 4921530, at *8-10 (W.D. Tex. Aug. 1, 2023). In addition, Plaintiffs point to two other recent cases where a state appellate court and this Court have found a municipality's ban on STRs to be unconstitutionally retroactive. *See City of Grapevine v. Muns*, 651 S.W.3d 317, 345 (Tex. App.–Fort Worth 2021, pet. denied) (upholding validity of retroactivity claim in a case about a complete ban on STRs where the city never previously regulated STRs); *Browning v. Town of Hollywood Park, Texas*, No. 5:23-CV-01485-XR, 2023 WL 9503457, at *2–4 (W.D. Tex. Dec. 22, 2023) (granting preliminary injunction in a case where Hollywood Park instituted an outright ban on STRs).

Unlike the challenged regulations in each of these cases, the 2023 Ordinance is not a ban on STRs. Despite Plaintiffs' repeated characterization of the Ordinance as a "ban," the Ordinance is a regulation that lays out an administrative scheme in which any property owner in the Village may obtain a CUP to operate an STR so long as they complete the application process and get approval

from the City Council. While Plaintiffs' cited cases are helpful in explaining how state and federal

courts have considered STR bans, they do not show that STR regulations are per se

unconstitutional. Each STR ordinance must be analyzed on a case-by-case basis. The key differences

in this case require the Court to consider the *Robinson* factors anew in the context of an ordinance

that merely regulates STRs.

### 1. The Nature and Strength of the Public Interest

Under the first *Robinson* factor, the Court considers the nature and strength of the Village's

interest in passing the 2023 Ordinance. In doing so, the Court should consider the legislative record

and other facts that support a governing body's actions. *See Zaatari*, 615 S.W.3d at 189 (citing

*Robinson*, 335 S.W.3d at 145). The record and facts should be sufficiently particularized to support a

finding of compelling public interest in support of the governmental body's action. For example, in

*Zaatari*, the Third Court of Appeals found that the City of Austin had failed to establish a

compelling public interest when the legislative record in the case did not describe specific concerns

related to the particular type of STRs prohibited by the City's ordinances. *See id.* Drawing an analogy

to *Zaatari*, Plaintiffs argue that the Village has no evidence and has conducted no studies to

demonstrate the specific harm that comes from short term rentals. (Mot., Dkt. 10, at 17). They

contend that any nuisance-type harms that the Village claims the 2023 Ordinance is ameliorating can

be addressed by nuisance, parking, and trash ordinances. (*Id.*).

The Village stated a few interests in passing the 2023 Ordinance. The Ordinance itself states

that in passing the Ordinance the City Council found that "regulating short-term rental is necessary

for the health, safety and welfare of the general public, the promotion of consistent land uses and

development, and the protection of landowners and residents of the Village of Volente." (2023

Ordinance, Dkt. 10-5, at 1). The City Council also recognized that the "historical nature of the

community is residential and the City Council wishes to preserve the quiet enjoyment of single-

family residential neighborhoods, which are the primary land use within the City, protect property values, and to promote orderly and safe use of property within these neighborhoods." (*Id.*). Last, it found that "the unregulated use, placement and operation of short-term rentals creates an additional enforcement burden, and merits a stand-alone ordinance to provide clear regulations for the permitting and licensing of such rentals." (*Id.*).

The Village's mayor, Thomas Blauvelt, explains in an affidavit how the Village's first STR ordinance came into being and how it has evolved over time. (Def.'s App'x, Dkt. 12-1, at 1–3). He states that the 2014 Ordinance was originally passed because the Village received "significant resident feedback" that sought an outright ban or stringent regulation of STRs. (*Id.* at 1). Minutes from Village meetings leading up to the passage of the 2014 Ordinance demonstrate that the City Council heard live testimony from nine residents with varied opinions about regulating STRs. (*Id.* at 11, 14–15). The City Administrator at the time also stated on the record at one of those hearings that approximately 60 residents had sent emails to comment on the STR discussions; of those 60 residents, she said that a "clear majority" wanted either a ban on STRs or strict regulation. (*Id.* at 15). City officials also expressed varied views on STRs. A council member began the discussion on the 2014 Ordinance by discussing how other cities at the time treated STRs and comparing the 2014 Ordinance to those cities that outright ban them. (*Id.* at 14). Most Village officials recognized that something had to be done to resolve residents' concerns about STRs and better acknowledge health and safety concerns that had arisen due to STRs. They discussed the possibility that, although the Village does not have its own police department, enforcement of an STR ordinance could be done through citizen complaints and witness testimony. Ultimately, instead of implementing a ban on STRs, as many residents wanted, the City Council instead decided to pass the 2014 Ordinance as a compromise between property owner's rights and the views of the community. (*Id.* at 16–17).

In his affidavit, Mayor Blauvelt explains that the Village then enacted a series of amendments to the STR Ordinance from 2014 to 2018 to adapt and hone the regulations, but throughout these amendments, the basic permit structure remained the same. (*Id.* at 2). Discussions surrounding the 2023 Ordinance began after the Village received multiple complaints regarding unpermitted STRs in the summer of 2022. The City Council decided to review the 2018 Ordinance to improve the effectiveness of the regulations by clarifying and enforcing the procedures and penalties within. (*Id.*). The mayor describes how on November 15, 2022, the City Council directed the Planning and Zoning Commission to review the 2018 regulations and present a recommendation for amendments.  (*Id.* at 2, 38). As part of this process, the Planning and Zoning Commission researched how other communities were regulating STRs and the mayor received updates from the Texas Neighborhood Coalition on STR issues around the state. The mayor attests that the Village's officials found it helpful to consider the experiences of other municipalities dealing with STRs in adopting the 2023 Ordinance. (*Id.* at 2). Former Village Administrator Lacie Hale also testified at the preliminary injunction hearing that the Village drafted the 2023 Ordinance after considering other cities' practices. (Minute Entry, Dkt. 19).

The record indicates that during the process of formulating and passing the 2023 Ordinance, the Village once again considered extensive resident feedback. The mayor states that "[o]ver the course of various public hearings, Village residents expressed their overwhelming support of regulating [STRs]." (Def.'s App'x, at 2). Various examples of public feedback during this timeframe can be seen throughout the record. (*Id.* at 43, 57–60, 89, 95). In fact, the complaints made specifically about Subia and Villanueva's STR seem to have been the impetus for the 2023 amendment process. Mayor Blauvelt explains that "[t]he specific and detailed concerns articulated by neighbors of [STR] operations were extremely persuasive" in adopting the 2023 Ordinance. (*Id.* at 3). He says that because the Village lacks its own police force and the Travis County Sheriff's Office

does not effectively enforce the Village's STR ordinance, the 2023 Ordinance was specifically drafted to rely on neighbor feedback. The mayor states that the City Council decided ultimately that a conditional use permit procedure best suits the needs of the residents because it requires public input and assists the Village in addressing the concerns of residents who have experienced a disruption to their right of quiet enjoyment of their property. (*Id.*).

The detailed exhibits and testimony provided by the Village demonstrate that the Village had a strong public interest in establishing the STR permit regulatory scheme and passing the 2023 Ordinance. In passing the 2014 Ordinance and the amended ordinance in 2023, the Village considered two categories of evidence. First, it considered how other municipalities in Texas have regulated STRs and modeled their ordinance based on their research. Though Plaintiffs fault the Village for not conducting its own studies to support the 2023 Ordinance, the Village was entitled to rely on the experiences of other municipalities in crafting its STR regulations because those experiences were relevant to the ordinance the Village was drafting. *See City of Renton v. Playtime Theatres Inc.*, 475 U.S. 41, 50–52 (1986) (holding that the City of Renton could rely on the experiences of Seattle and other cities in enacting a zoning ordinance banning adult theaters in certain areas because that information was "reasonably believed to be relevant to the problem that the city" was addressing). The Village's reliance on other municipalities' experiences regulating STRs supports a finding that the 2023 Ordinance was tailored to address the interests that the Village set out to rectify.

Second, the Village consistently heard and considered specific concerns from its residents before passing both the 2014 and 2023 Ordinances. Before these ordinances were passed, residents in the Village were concerned that STRs had disrupted the small, historically residential nature of their community. The 2023 Ordinance creates a regulatory scheme that institutionalizes a role for public feedback. The Ordinance therefore specifically responds to concerns that residents had by

16

ensuring that STR permits are only given to residents that can operate STRs without disrupting the permanent residents of their neighborhoods. Given the Village's small size, it is reasonable that the City Council would feel compelled to respond after hearing repeated complaints about STRs. Further, given that the Village does not have its own police force and the Village has not believed that the Travis County Sheriff's Office has been effective at enforcing its previous STR ordinances, it is reasonable that the Village would want to rely upon public feedback in the STR permitting process, rather than trying to address noise, parking, and trash complaints through other ordinances.

The Village decided to enact the 2023 Ordinance because it wanted to regulate STRs more effectively in order to protect the public health, safety, and welfare of its residents and preserve the historically quiet and residential nature of the community; these reasons constitute compelling public interests. *Cf. Draper v. City of Arlington*, 629 S.W.3d 777, 786–87 (Tex. App.—Fort Worth 2021, pet. denied) (in a due course of law analysis, finding that the City of Arlington had legitimate governmental interests when it passed an STR regulation because it did so to safeguard the life, health, and safety of the public and to minimize the adverse impacts of STRs on historically residential communities). The 2023 Ordinance was passed only after the Village's careful consideration of other municipalities' experiences with STRs and hearing the concerns of many Village residents over the span of nearly ten years. The Court finds that this case is different from *Zaatari* and the other case law that Plaintiffs cite because the record is sufficiently particularized to support the Village's action. Accordingly, the nature and strength of the public interest factor leans heavily against a finding of unconstitutional retroactivity.

2. The Nature of the Prior Right Impaired and Extent of the Impairment

The remaining factors from the *Robinson* test ask the Court to "balance the purpose [of the regulation] against the nature of the prior right and the extent to which the [regulation] impairs that right." *Zaatari*, 615 S.W.3d at 190.

17

When considering the nature of the prior right, courts should "consider not whether the impaired right was 'vested,' but the extent to which that right was 'settled.'" *Id.* (citing *Robinson*, 335 S.W.3d at 142–43, 147, 149). Private property ownership is a fundamental right, and the ability to lease property is a fundamental privilege of property ownership. *Id.* However, "the right to lease property for a profit can be subject to restriction or regulation under certain circumstances." *Id.* at 191 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 436 (1982)). Further, the Texas Supreme Court has recognized that "limitations on property rights" may arise as a result of "appropriate government action under its police power," including when regulating nuisances. *Severance v. Patterson*, 370 S.W.3d 705, 710 (Tex. 2012). Importantly, regulations that give municipal officials the discretion to grant or deny a permit do not create "constitutionally protected property interests." *Legacy Hous. Corp. v. City of Horseshoe Bay*, No. 1:21-CV-1156-RP, 2023 WL 4707143, at *7 (W.D. Tex. July 23, 2023), *report and recommendation adopted by* 2023 WL 6233870 (W.D. Tex. Sept. 25, 2023) (citing *Horton v. City of Smithville*, 117 F. App'x 345, 348 (5th Cir. 2004)).

In *Zaatari*, the Austin Court of Appeals found that the STR operators in that case had a settled interest in their right to lease their property for short terms because the City of Austin had historically allowed STRs and Austinites had long exercised their right to lease their property for short terms. *Zaatari*, 615 S.W.3d at 191. In contrast, the record in this case indicates that beginning with the 2014 Ordinance, the right to lease property in the Village through STRs was subject to a permitting process. According to the text of the 2014, 2015, and 2016 Ordinances, Village officials had discretion to grant or deny an STR permit. (2014 Ordinance, Dkt. 10-1, at 3; 2015 Ordinance, Dkt. 10-1, at 3–5; 2016 Ordinance, Dkt. 10-1, at 2–4). Former Village Administrator Hale also confirmed this practice of discretion at the preliminary injunction hearing. (Minute Entry, Dkt. 19). Each of the Plaintiffs in this case purchased their property after the 2014 Ordinance came into effect: Langer in 2016 and Subia and Villanueva and the McConvilles in 2018. Therefore, they

purchased their property with the expectation that their right to operate an STR was subject to a discretionary permitting process. Accordingly, none of the Plaintiffs have a constitutionally protected interest in leasing their properties for short terms by right and without restriction.[2]

Plaintiffs focus much of their motion on the idea that the 2023 Ordinance differs significantly from the Village's previous ordinances in that the previous ordinances allowed a property owner to obtain an STR permit if they met certain objective requirements, whereas the 2023 Ordinance institutes a process that involves a subjective criteria through a public hearing and approval process. (*See* Mot., Dkt. 10, at 6–8, 17). However, from the 2015 Ordinance and on, the Village's STR regulations have always required that public hearings be held prior to approval of STR permits. (*See* 2015 Ordinance, Dkt. 10-2, at 4–5). In laying out the criteria that the Planning and Zoning Commission and City Council had to consider when deciding whether to approve STR permits, the 2015 Ordinance sets out a standard that is virtually the same as the one that exists in the 2023 Ordinance: namely, that the Commission and Council should consider "the impact of the conditional use on and the compatibility of the use with, surrounding properties and neighborhoods to ensure the appropriateness of the use at a particular location." (*Id.* at 5; *see also* 2023 Ordinance, Dkt. 10-5, at 8). According to Mayor Blauvelt in his declaration and Former Village Administrator Hale at the preliminary injunction hearing, it is true that prior to the 2023 Ordinance, the Village did not require the public hearings typically associated with conditional use permits. (*See* Def.'s App'x, at 2; Minute Entry, Dkt. 19).[3] However, the Court finds that the text of the previous ordinances

_____

[2] The Court is also skeptical that Plaintiff Langer has standing to assert the retroactivity and ultra vires claims asserted because she was successful in obtaining an STR permit under the 2023 Ordinance. Her asserted fear that the 2023 Ordinance places her in "imminent jeopardy" of losing her STR permit due to the Ordinance's complaint and revocation process is likely insufficient to establish that she has an injury that is "concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Because this issue was not briefed nor discussed at the preliminary injunction hearing, the Court does not conclusively hold that she lacks standing to assert these claims at this early stage of the litigation.

[3] In her testimony at the preliminary hearing, Former Village Administrator Hale stated that another reason that the Village began adhering to the public hearing requirement is because it thought it had to under Texas law. Under Texas's Local Government Code, any zoning regulation is not effective under after a public

19

sufficiently put Plaintiffs on notice that the Village could require public hearings and subjectively consider the compatibility of an STR at their property before issuing them an STR permit.

Last, the Court considers the extent of the Ordinance's impairment of the prior right to lease for short terms. At issue in *Zaatari* and the other case law that Plaintiffs cite were city ordinances that outright banned STRs. Courts in those cases found that those ordinances significantly impacted the plaintiffs' prior rights. *See, e.g., Zaatari*, 615 S.W.3d at 191. As noted above, however, what distinguishes this case from those cases is that the 2023 Ordinance is not an outright ban on STRs, but rather a regulation of them. The Ordinance has led to mixed results for STR applicants. While the 2023 Ordinance has led to the City Council denying Villanueva and Subia and the McConvilles' requests for STR permits, other STR permits have been approved in the Village, including Langer's most recent application for STRs. (*See* Def.'s App'x, Dkt. 12-1, at 3, 101).

Viewing all the *Robinson* factors together, the Court finds that overall, they weigh against a finding of unconstitutional retroactivity. The Village had a compelling public interest in passing the 2023 Ordinance. While Plaintiffs' right to lease their property has been impaired, they did not have a settled right to lease their property for short terms with no restrictions because they bought their property at a time when the Village had already established a discretionary permitting process. Thus, the Village's public interest in enacting the Ordinance outweighs the impairment of Plaintiffs' interest in renting their homes for short terms. Accordingly, the Court finds that Plaintiffs have not demonstrated a substantial likelihood success on the merits of their retroactivity claim.

---

hearing is held on the matter and residents have an opportunity to be heard. Tex. Loc. Gov't Code § 211.006(a) (2003). Because the Village's STR ordinances instituted a conditional use permit scheme and conditional use permits change the zoning determination of the property that are issued to, the Village believed that approval of any resident's STR permit required a prior public hearing. The Court does not hold that the Village violated the retroactivity clause of the Texas Constitution merely by attempting to abide by Texas's open government laws.

**B. Ultra Vires Claim**

Next, Plaintiffs argue that the 2023 Ordinance is invalid because the Village did not have regulatory authority in enacting it. They offer two theories on their ultra vires claim. First, Plaintiffs contend that the 2023 Ordinance is not a zoning ordinance at all and thus the Village had no authority in passing it. Second, they argue that even if the 2023 Ordinance could be considered a zoning ordinance, it is invalid because it is arbitrary, capricious, or unreasonable.

1. The 2023 Ordinance is a zoning ordinance.

The Village of Volente is a Type B General Law municipality operating pursuant to Chapter 7 of the Texas Local Government Code, a category applicable to cities between 201 and 9,999 inhabitants. *See* Tex. Local Gov't Code § 7.001 (1987). General Law municipalities obtain their power through the state legislature and "possess [only] those powers and privileges that the State expressly confers upon them." *Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 645 (Tex. 2004). The state legislature has empowered such municipalities to zone through the Texas Zoning Enabling Act, at Local Government Code Chapter 211. This chapter provides that "a municipality may regulate . . . the location and use of buildings, other structures, and land for business, industrial, residential, or other purposes." *Id.* § 211.003. The guiding principle of any municipality's exercise of zoning authority is whether such action is taken "for the purpose of promoting the public health, safety, morals, or general welfare." *Id.* § 211.001.

However, "[n]ot all regulation of land use constitutes zoning." *Powell v. City of Houston*, 580 S.W.3d 391, 398 (Tex. App.—Houston [1st Dist.] 2019), *aff'd*, 628 S.W.3d 838 (Tex. 2021). Courts decide as a question of law whether a given ordinance, no matter how categorized, is in fact a zoning ordinance. *See, e.g., Powell*, 628 S.W.3d at 848. In *Powell v. City of Houston*, the Texas Supreme Court identified several key features that are common to zoning ordinances: "implementation of a

21

comprehensive plan of city-wide development, division of the city into geographic districts, and specification of the uses to which land can be put within each district." *Id.* at 846.

Plaintiffs' primary argument is that the 2023 Ordinance is not a zoning ordinance because the Village has no evidence that the Ordinance advances any zoning interest. (Pls.' Letter Br., Dkt. 21, at 3). Plaintiffs claim that the Village cannot provide any evidence to support their ordinance because "there's no meaningful difference between a 29-day lease and a 30-day lease except the mere fact of duration, which is an arbitrary line . . . ." (*Id.* at 4). This argument is unavailing for the same reasons the Court laid out above in assessing the nature and strength of the Village's public interest in enacting the 2023 Ordinance. Line-drawing does not inherently render a regulation arbitrary. *See Sinclair Broad. Grp., Inc. v. F.C.C.*, 284 F.3d 148, 162 (D.C. Cir. 2002) ("[T]he court is generally unwilling to review line-drawing performed by [an agency] unless a petitioner can demonstrate that the lines drawn . . . are patently unreasonable, having no relationship to the underlying regulatory problem.") (cleaned up). In this instance, the Court is satisfied that the Village had ample evidence to conclude that STRs caused a distinct harm to its residents and that regulating STRs would promote the general welfare of its residents.

Plaintiffs next argue that the 2023 Ordinance cannot be a zoning ordinance because in regulating duration of occupancy, the Ordinance is "too narrow" and "does not apply uniformly or comprehensively within each" zoning district. (*Id.*). Plaintiffs again rely heavily on *Zaatari*, which held that the City of Austin's STR ban did "not advance a zoning interest because both [STRs] and owner-occupied homes are residential in nature." *Zaatari*, 615 S.W.3d at 190. Plaintiffs claim that in order for the 2023 Ordinance to be a valid zoning ordinance it would have had to "forbid anyone from occupying any home in a single-family residential district for less than 30 days, owner or tenant" or else it would have had to "forbid all leasing of homes given that there is no demonstrated

difference between a 29-day lease and a 30-day lease except duration itself." (Pls.' Letter Br., Dkt. 21, at 4).

The Court finds that the 2023 Ordinance is properly classified as a zoning ordinance for a few reasons. Most importantly, the 2023 Ordinance relies on a common zoning tool, conditional use permits ("CUP"), sometimes referred to as special use permits. A CUP is a legislatively adopted amendment to a municipality's overall zoning ordinance that alters the zoning regulations on a certain tract of land within a municipality. Tex. Att'y Gen. Op. JM-493, at 3 (May 19, 1986). CUPs have been recognized and consistently upheld by Texas courts since the 1950s. *See Sherwood Lanes, Inc. v. San Angelo*, 511 S.W.2d 597, 598-99 (Tex. App.—Austin 1974, writ ref'd n.r.e.) ("In Texas, retention by the governing, or legislative, body of the city of power to issue special permits has been upheld by the courts . . . [w]hen the governing body authorizes a special permit by enactment of an ordinance amending the general zoning ordinance . . . the enactment is an exercise of legislative power."); *see also City of Lubbock v. Whitacre*, 414 S.W.2d 497, 499 (Tex. App.—Amarillo 1967, writ ref'd n.r.e.); *Clesi v. Northwest Dallas Imp. Ass'n*, 263 S.W.2d 820, 826-28 (Tex. App.—Dallas 1953). The 2023 Ordinance follows the typical process of implementing CUPs: The Ordinance itself authorizes the issuance of CUPs for STRs in general and then institutes a process by which the City Council can approve a CUP on a specific property if STRs are appropriate use on that property. The Ordinance's institution of a typical zoning practice is strong evidence that it is itself a zoning ordinance.

Further, the Ordinance abides by the principles laid out in *Powell* as key characteristics of zoning ordinances. The Village has implemented a comprehensive zoning plan that divides the Village into geographic districts. The Village has also specified the land uses that can be implemented in each district by identifying certain land uses that can be appropriate in some districts, depending on the circumstances. The 2023 Ordinance is a regulation that does just that: It

23

specifies that STRs are not a valid land use in any residential or commercial district in the Village unless the owner receives a CUP for the use. Therefore, under the *Powell* test, the 2023 Ordinance bears the characteristics of a typical zoning ordinance.

Last, the Court disagrees with Plaintiffs' argument that the 2023 Ordinance cannot serve a zoning interest because STRs and owner-occupied homes are both residential in nature. Plaintiffs rely on *Zaatari* for support of this argument, but the Court finds that *Zaatari* is not conclusive on this issue.[4] The *Zaatari* Court's discussion of this principle was brief and mostly relied on a case that interpreted whether STRs were allowed under a restrictive covenant that stated that all properties were to be used solely for "residential purposes." *Zaatari*, 615 S.W.3d at 190 (citing *Tarr v. Timberwood Park Owners Ass'n, Inc.*, 556 S.W.3d 274, 291 (Tex. 2018)). But a restrictive covenant is not the same concept as a zoning regulation. In fact, in another Texas intermediate appellate case handed down two years after *Zaatari*, the Fort Worth Court of Appeals found that a zoning-based STR ordinance permissibly exercised the municipality's police power. *See Draper*, 629 S.W.3d at 786–87. The *Draper* court found that the municipality had identified a series of "legitimate governmental interests" that supported the STR ordinance, including "(1) safeguarding the life, health, safety, welfare, and property of STR occupants, neighborhoods, and the general public and (2) minimizing the adverse impacts resulting from increased transient rental uses in neighborhoods that were planned, approved, and constructed for single-family residences." *Id.* at 786. The *Draper* decision demonstrates that the Texas intermediate courts are split as to whether STR uses are purely

---

[4] In cases such as this where federal courts must interpret state law in the absence of a definitive decision from the state's highest court, federal courts "must make an *Erie* guess and determine as best [they] can what the Supreme Court of Texas would decide." *Martinez v. Walgreen Co.*, 935 F.3d 396, 398 (5th Cir. 2019). In making an *Erie* guess, federal courts should "defer to intermediate state appellate court decisions, unless convinced by other persuasive data that the highest court of the state would decide otherwise." *Mem'l Hermann Healthcare Sys. Inc. v. Eurocopter Deutschland, GMBH*, 524 F.3d 676, 678 (5th Cir. 2008).

residential and, even if they are, if that fact alone means that a municipality cannot regulate the use of a residential use in residential zones under its zoning authority.

The Court is not persuaded that STRs constitute a purely residential use of property. STRs involve the residential use of property because visitors reside or live in the home for a period of time. However, there is also a commercial aspect of STRs and because of the transient nature of STR guests, STRs share attributes of hotels. Therefore, STRs may be better characterized as a quasi-residential use of property. Even if STRs are purely residential uses, courts have found that municipalities can enact zoning regulations to address residential-type uses within residential zoning districts. *See Avalon Residential Care Homes, Inc. v. City of Dallas*, 130 F. Supp. 2d 833, 840 (N.D. Tex. 2000) (upholding a city zoning law that required special use permits to operate care homes in residential districts); *Jackson Court Condominiums, Inc. v. New Orleans*, 874 F.2d 1070, 1077 (5th Cir. 1989) (upholding a prohibition on time-share condominiums in residential areas). Therefore, even if STRs are classified as a purely residential land use, it is not clear that restricting them in residential districts would be impermissible under a municipality's zoning authority.

In sum, the Court finds that the 2023 Ordinance is a zoning regulation because it institutes a commonly used zoning tool, the conditional use permit, that states that a specific land use, STRs, are not allowed in the Village's residential or commercial districts unless authorized by the CUP process. The Village's regulation of this quasi-residential land use even in residential zoning districts is not unprecedented nor does it exceed the bounds of zoning authority. Having concluded that the Ordinance is a zoning regulation, the Court next determines if it was a valid exercise of zoning authority.

### 2. The 2023 Ordinance is a valid exercise of zoning authority.

The Fifth Circuit has recognized that, in Texas, "zoning ordinances are valid exercises of a city's police powers." *Tex. Midstream Gas Servs. LLC v. City of Grand Prairie*, 608 F.3d 200, 207 (5th

Cir. 2010) (citing *City of Pharr v. Tippitt*, 616 S.W.2d 173, 175–76 (Tex. 1981)). "If reasonable minds may differ as to whether or not a particular zoning ordinance has a substantial relationship to the public health, safety, morals or general welfare, no clear abuse of discretion is shown and the ordinance must stand as a valid exercise of the city's police power." *City of Pharr*, 616 S.W.2d at 176. Municipal zoning ordinances are "presumed to be valid," and the party challenging a zoning ordinance must prove its invalidity. *See Safe Water Found. of Tex. v. City of Houston*, 661 S.W.2d 190, 192 (Tex. App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.). The Texas Supreme Court has explained that this presumption requires a party challenging the zoning regulation to satisfy the "extraordinary burden" of proving that a municipality acted outside the bounds of the police power. *Univ. Park v. Benners*, 485 S.W.2d 773, 779 (Tex. 1972). The party must "generally or as to particular property, . . . prove that the ordinance is arbitrary or unreasonable in that it bears no substantial relationship to the health, safety, morals or general welfare of the community." *City of Pharr*, 616 S.W.2d at 176.

Plaintiffs argue that the 2023 Ordinance is "by definition arbitrary, capricious, or unreasonable" because the Village has "declared a residential use inconsistent with a residential use." (Pls.' Letter Br., Dkt. 21, at 4). They also contend that the fact that the Village has "no data, studies, or evidence supporting its claims of harm from duration of tenant occupancy" enhances the arbitrary nature of the ordinance. (*Id.*). As the Court has explained above, neither argument invalidates the ordinance. The Village has provided sufficient evidence of the harms that STRs have imposed on the Village. And the Village's decision to require CUPs for STRs is not inherently unreasonable considering that multiple courts have upheld restrictions on residential uses in residential zoning districts. The Village has also demonstrated that the Village's decisions to deny Villanueva and Subia and the McConvilles' STR applications was reasonable because their STR uses

26

were contrary to the general welfare and incompatible with the historically quiet and residential neighborhoods in the Village.

Instead, the Court finds that the 2023 Ordinance is a valid exercise of the Village's zoning authority. The City Council decided to regulate STRs in the Village in order to promote consistent land uses, protect the historically residential nature of the Village and preserve the quiet enjoyment of single-family neighborhoods within the Village. (*See* 2023 Ordinance, Dkt. 10-5, at 1). These are legitimate governmental concerns that fall within the Village's police powers. *See, e.g.*, *Draper*, 629 S.W.3d at 786–87; *Jackson Court Condominiums*, 874 F.2d at 1077. While reasonable minds may differ about whether requiring conditional permits for STRs is necessary to protect the health, safety, or general welfare of the Village's residents, deciding to regulate STRs in this way is not an abuse of the Village's discretion. *See City of Pharr*, 616 S.W.2d at 176. Plaintiffs have not met their heavy burden of demonstrating that the 2023 Ordinance has no substantial relationship to the health, safety, or general welfare of the community. Therefore, they are unlikely to succeed on the merits of their ultra vires claim.

### C. Freedom of Assembly

Last, Langer argues that the Langer Ordinance—the ordinance approving a conditional use permit for STRs on her property—violates her freedom of assembly under both the United States and Texas Constitutions because it bans outdoor activity between 10:00 pm and 7:00 am. (Mot., Dkt. 10, at 19). In the motion, Langer simply states that "*Zaatari*'s extensive analysis on this issue controls." (*Id.* (citing *Zaatari*, 615 S.W.3d at 192–202)). At issue in this portion of *Zaatari* were the Austin STR regulations that forbade property owners and STR tenants from using STRs for outdoor assemblies of more than six adults between 10:00 pm and 7:00 am. *Zaatari*, 615 S.W.3d at 192. The Third Court of Appeals found that the regulations violated the property owners' freedom of assembly after a lengthy discussion of how the First Amendment of the U.S. Constitution and article

I, § 27 of the Texas Constitution protect such a right to assemble on private property. *Id.* at 192–202. Langer contends that *Zaatari* applies to her; she argues that the Langer Ordinance limits her freedom of assembly because she lives on the same property that is subject to the outdoor assembly restriction. Plaintiffs respond that the Langer Ordinance does not apply to her personal use of her property and thus she does not have standing to bring a freedom of assembly claim. (Resp., Dkt. 12, at 18).

The central issue to this claim is whether the Langer Ordinance applies to Langer's personal conduct or whether it only applies to STR tenants on Langer's property. The City Council approved a STR permit on Langer's property with several special terms and conditions. Specifically, the Langer Ordinance states the following conditions of Langer's CUP:

- No rental of accessory structure should ever occur.
- Max occupancy at any time is 8.
- Parking should not exceed 8 cars on premises.
- Boat dock will be inspected with the correct document.
- House rules, rental agreement, and advertisement will be consistent and conditioned related to the conditional use permit.
- Outside activities end at 10:00 pm to 7:00 a.m.

(Langer Ordinance, Dkt. 10-18, at 20). Langer argues that because she lives in an accessory structure on the same lot as the main house that is rented out for STRs, the ordinance limits her own ability to assemble outdoors during the prohibited hours. (Reply, Dkt. 15, at 10). At the preliminary injunction hearing, Langer further testified that she believes that this ordinance prohibits her from even using her driveway— which is the same for both her accessory dwelling and the main house—to take out her garbage at night. (Minute Entry, Dkt. 19).

The Court disagrees. Although the Langer Ordinance approves a conditional use permit for STRs on Langer's entire property, the outdoor activity prohibition condition is listed lines below a condition that explicitly states that the accessory structure where Langer lives cannot be used for rentals. Therefore, viewing the outdoor activity prohibition in context of the other conditions and

the entire ordinance, it is clear that the prohibition on nighttime outdoor activities only applies to STR tenants in the main house. Nor is there any extrinsic evidence that the Village crafted the condition to restrict Langer's personal assembly rights or intends to enforce the condition against her personally. At the preliminary injunction hearing, Langer stated that someone at the Village had told her that the outdoor activity prohibition applied to the entire property, but she could not remember who the official was who said this or any other details as to this conversation or communication. (*Id.*). Langer also testified that no one at the Village has ever complained to her about her own nighttime activities on her property. (*Id.*). The Court finds that Langer has not provided sufficient evidence that the Ordinance applies to her residential use of her property or that the Village intends to enforce it against her based on her residential use.

Because the ordinance does not apply to Langer, Langer lacks standing to bring a freedom of assembly claim. To establish standing to seek redress for injury, "a plaintiff must be personally aggrieved." *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304 (Tex. 2008) (citing *Nootsie, Ltd. v. Williamson Cty. Appraisal Dist.*, 925 S.W.2d 659, 661 (Tex. 1996)). In addition, the plaintiff's alleged injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, (1992) (cleaned up). In *Zaatari*, the Third Court of Appeals was satisfied that at least one plaintiff had standing to bring freedom of assembly claims on behalf of STR tenants because at least one of the *Zaatari* plaintiffs was both an operating licensee and a tenant of STRs. *Zaatari*, 615 S.W.3d at 183. Here, however, Langer is not personally aggrieved by the outdoor assembly prohibition and her subjective belief that it applies to her is not sufficient to establish standing. *Zaatari's* freedom of assembly analysis is thus distinguishable. Accordingly, the Court lacks subject matter jurisdiction to hear the freedom of assembly claim, rendering Langer highly unlikely to succeed on the merits of that claim.[5]

---

[5] The Village also argues that Langer lacks the ability to assert third-party standing on behalf of her STR tenants to argue that the Langer Ordinance violates their freedom of assembly rights. (Resp., Dkt. 12, at 18–

## IV. CONCLUSION

In passing the 2023 Ordinance, the Village of Volente sought to find a compromise between the private property rights of those who wished to operate STRs and other residents in their community who wished to enjoy their property free of the issues that had arisen in the Village due to STR tenants. In doing so, the Village's action abides by a well-trodden principle in property law: that "all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 491–92 (1987). The Court finds no reason at this stage of the litigation to interfere with the wide range of discretion the Village is afforded to decide for itself which STR uses are compatible with its community and which are not.

For the reasons stated above, the Court finds that Plaintiffs are unlikely to succeed on the merits of the three claims that form the basis of their motion for preliminary injunction. Therefore, the Court does not address the other preliminary injunction requirements.

Accordingly, **IT IS ORDERED** that Plaintiffs' motion for a preliminary injunction, (Dkt. 10), is **DENIED**.

SIGNED on May 13, 2024.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

---

19). In support, they cite the *Draper* case, which found that STR owners lacked standing to bring freedom of assembly claims on behalf of STR tenants because the court could not find Texas caselaw that supported claims of third-party standing. *Draper*, 629 S.W.3d at 791. The Village also argued that third-party standing was not warranted in this case under the few federal law cases that have allowed third-party standing. *See, e.g.*, *Eisenstadt v. Baird*, 405 U.S. 438 (1972); *Barrows v. Jackson*, 346 U.S. 249 (1953). Langer does not purport to assert third-party standing in her brief, and at the preliminary injunction hearing, Plaintiffs' counsel stated that they were not relying on such a theory. Therefore, the Court does not address whether Langer's claim would be likely to succeed on the merits under a theory of third-party standing.